You may proceed. Good morning, and may it please the court. My name is David Axelrod. I'm appearing on behalf of more than a dozen corporate employers in the Commonwealth of the Northern Mariana Islands and thousands of their employees, none of whom have ever been into the United States or received any immigration status under any U.S. immigration laws. This is not a tax case. This is a political case. It turns on the determination of what agreement was struck between the two sovereign representatives for the United States on the one hand and for the citizens of the Northern Mariana Islands on the other hand in early 1975 with respect to which groups would participate in the relatively lucrative benefits of the U.S. Title II Social Security programs, and who would bear the burdens of the taxes supporting those programs. The key document is the covenant. If Title II benefits and supporting taxes don't apply geographically by reason of the force of the covenant alone, then it is clear that no other law provides for a geographic application. It's not disputed, but that Congress passed no law after its 1976 approval of the covenant, in which it applied FICA taxes or Social Security benefits under Title II geographically to the Northern Mariana Islands. We submit that properly construed against the party's negotiating history and the key events that Congress implemented and undertook in implementing Section 606 of the covenant, it is clear that the parties intended and Congress implemented a citizenship based application of Section 606. Within the covenant itself, only Section 606 addresses Title II benefits and supporting taxes. As described by the Department of the Interior to Congress, Section 606 is a technical provision that is concerned with segregating the retirement accounts belonging to the citizens of the Northern Mariana Islands, transferring them out of the trust territory system, holding them in abeyance and administered by the U.S. until the U.N. trusteeship agreement terminated, and then merging it with the U.S. system. First of all, it's hard to get that out of the text of 606B, but assuming it for the moment, then we have 601C. So why isn't that? 601C is a provision that addresses Section 601, which is concerned exclusively, as this court determined in the Armstrong decision, with the application and development of a local territorial income tax modeled as a mirror code after the U.S. tax. It applies only in the CNMI. But C says generally references in the Internal Revenue Code to Guam will be deemed also to refer the Northern Mariana Islands without limitation. And as my understanding is that the main argument about why that doesn't apply is because 606B is more discreet. But if 606B doesn't cover non-citizens, then why doesn't 601C cover them? Because 606B doesn't cover non-citizens because the party's intended not to cover aliens within those programs. That, I submit, is the clear conclusion that one comes through walking the legislative history and the drafting changes that were made with respect to Section 606B between the fifth, which was intended to be a final draft of the covenant, and the last-minute changes that were made at the behest of Congress, which dramatically changed the application of Section 60B. Why do we go behind the plain language of 606B? I mean, it is what it is. Why do you urge us to look at the legislative history of this? There are two critical components that respond to that. First, Section 606B is qualified by the fact that the Joint Drafting Commission, the representatives of both of the parties that were at the table, expressly issued a qualifying clause at the time that it inserted the, as they apply to Guam, clause into 606B that says, we are using these clauses in different ways in context, sometimes to refer to the citizens and residents of the entity, in this context, the Northern Mariana Islands. In other contexts, it can apply geographically to the territory. Thus, as they apply to Guam, which is used only in those sections that are addressing the application of benefits to the islands. Who's going to be able to participate in the U.S. benefits programs? They applied that clause as a term of art, and the term of art is inherently ambiguous because it provides for alternative applications. It's either citizens and residents or it's geographic, and you have to look at the context and the party's actions to determine which it is. And when you do that, you can see very clearly, both from the dramatic differences between the situation in Guam and the CNI with respect to the treatment of aliens as to whether or not they are within the geographic United States. In Guam, they clearly are because Congress legislated that the INA would apply. Congress took over immigration authority. Congress expressly added them to the FICA geographic scope, and Congress expressly added Guam to the geographic scope for Title II benefits. In contrast with the CNMI, over a period of more than 20 years, Congress did exactly the opposite. This is one problem I've had with your argument all along, but even going back to legislative history or the drafting statement, it doesn't say what you said it said. It said, or the people who reside in or are citizens of those geographic areas. And the reason for that is as they apply to Guam, it shows up in two contexts. 606B, where it was added along with, at the same time that they issued this qualifying statement, and 501A1. The point is that it's not limited to citizens, even if you go beyond the language of the covenant. Could you repeat that question? It's not limited to citizens. It includes residents. Yes, depending on the context. It could either be the geographic area I mentioned, or it could be the people who reside in or are citizens of the geographic area. It could either be geography or people, but it doesn't say it could be citizens only. In context, it can be citizens only. And in context, it can apply more broadly to residents, because in 502A1, they were dealing with SSI, which applies to residents who have been in a territory covered by the law for more than five years. In 606B, FICA, as to jurisdictions that are outside the United States, is only going to apply and be payable to citizens of that jurisdiction. And that, we submit, is clear really what the focus of the drafting parties was. A second response to your question as to why we can look, indeed we submit you are compelled to look at the detail of this, is this is not a statute that was enacted by Congress's legislative authority. That much is clear. This agreement, the covenant, originates in a sovereign negotiation. To some degree it seems to me you're right, but I don't understand that the law relating to treaties means that you ignore the language as opposed to illuminate it. It doesn't say that you ignore the language, and we are not ignoring the language. We are looking at the language in the context of what the joint drafting committee said that it wants that language to apply to, which said it can alternately apply to citizens and or residents or be broader geographically. You have to determine what was intended. But the key part of the fact that the Zang court and the lower court both applied a restrictive statutory limitation on what they were going to look at is a clear error in both of those cases. Because under the Supreme Court decision cited in our brief and in the supplemental briefing to this court, it's very clear that when you have a political agreement, a contract between the two sovereigns, and clearly that is what you have in this case, the court's inquiry is much broader. It is a determination to figure out what the intent of those political parties was and to implement it. The context of the agreement, what the parties did after the agreement was entered into, what they said, what the legislative history is, and what the negotiating history was. When you apply those factors here, and one of the important things that they iterate, which I think has significance in this case, is that when you have a comprehensive agreement or a comprehensive resolution, where you have omissions, those omissions have great significance. You can't ignore them or assume it was an error. You have very, very material omissions in this case. With respect to the FICA geographic tax provision of 26 U.S.C. 3121E, Congress very carefully did not include the CNMI in that provision. Or in any other. In other words, CNMI, as I understand it, is not in the FICA provisions in the statute. That's why you have this language about as it applies to Guam, because Guam is. I disagree, Your Honor, obviously. In every case where Congress has taken in an insular territory, it has gone back, if it intended, and amended 3121E. But it didn't do it. It didn't do it in this case. That's why you have all this language about as it applies to Guam. I don't understand your argument. Let me argue with you, if I may. You are begging the question to be decided, which is did Congress intend a citizenship application or a territorial application? If Congress intended, as we believe the record clearly shows in the negotiating history and congressional actions, a citizenship-based application, then the fact that Congress did not go back as it did in every other case and add the insular territory into 3121E is strong evidence that they intended not to. They've revisited 3121E 17 times. In both 606B and 601A. Because they used as it applies to Guam as a term of art to restrict or define subgroups depending on the context. The two sections that it has applied to are those which provide U.S. benefits to the Northern Mariana Islands. They were deliberately restricting those benefits to the citizens of the Northern Mariana Islands. It is difficult for, I think, anyone objectively to conclude that the negotiators for the United States and the citizens of the Northern Mariana Islands intended to extend U.S. Social Security benefits programs to thousands of aliens from China, Bangladesh, Myanmar, the Philippines and other countries who are in the CNMI based solely on decisions of the local Marianas government who was granted control over immigration to the exclusion of the United States and the Immigration and Naturalization Act. It creates a circumstance which is highly implausible on its face, I would submit. And if you look at the and walk through that negotiating history you will see from the changes that start with the fifth round draft which in its language invited a geographic application but was rejected by the U.S. representatives and modified into something that no longer represents or resembles in any way a geographic application. They took that potential geographic application then in section 605 of the fifth round draft and they in essence eviscerated and then added a qualifying clause  can apply alternatively only to citizens and residents or citizens or residents or geographically depending on context. And that became the issue and that's how they settled the case and there was no further illumination or step taken by the United States or Congress after adoption of the covenant to apply a geographic coverage for FICA or Social Security benefits. And I think that is most clear when you go back and you look at the only time that Congress revisited this subject. I mean if you want my reaction to all this is it still says you're no good at all because it says citizens or residents not citizens. So I don't understand your argument. I really just don't understand it. You seem to be saying that even though it says citizens on the one hand it's geographical on the other hand citizens or residents it means sometimes citizens or sometimes residents. Is that what you're saying? No. What I'm saying is that it is narrowed to in 606B it means citizens because FICA taxes and Social Security benefits when you're outside the United States are only available to citizens but residents are not aliens. The clause means citizens or residents both of them, either one and not sometimes one and sometimes the other. I mean you have to make 16 jumps to get what you're trying to get. You have to get by the language of the covenant and you have to get by the language of the legislative history. It's really extremely difficult. If I can jump in it seems to me how I would put Judge Berzon's question it seems to me there was an easy way to Congress to make the point you want to make. And they didn't make it that way. And to get to the direction you want us to go we have to do all these gymnastics to get there. Can you explain why Congress simply didn't just say what you want us to infer that it said as opposed to having us infer what it said based on this Rube Goldberg type machinery that we have to deal with here? I would submit to you that Congress did say what we say it said when it failed to take action to add the CNMI into 3121E when it failed to take action to have Title II benefits applied geographically to the CNMI when it revisited the... Why did it have to amend its FICA statutory language when they could take care of it by the language in the covenant? Because the language in the covenant doesn't take care of it. The language in the covenant left it open. The language in the covenant says this can apply in either of alternate ways. So the language of the covenant itself is ambiguous. If you look at Guam's situation aliens are covered because Congress specifically took steps to cover them. In the CNMI, both under the covenant where aliens and the CNMI in its entirety are excluded from the coverage of the Immigration and Naturalization Act aliens are, as a matter of law, outside the United States. Congress then did nothing to bring them within the United States. When you get to Public Law 98213 which specifically addresses this issue in context Congress took steps to relieve the delay that the citizens of the Northern Mariana Islands were experiencing by waiving the citizenship condition under the FICA law as it applies outside the United States so they could get benefits before the effective date and it took no steps to apply that geographically. Then it added on its own initiative wholly apart from the petition of the Commission Section 19B, and Section 19B addresses aliens. Aliens are a separate category from residents. They are people who are admitted with no residence or potential immigration status into the Commonwealth of the Northern Mariana Islands for work purposes. It referred to aliens in there and said as to aliens and used key language indicating that it was referencing the Title II benefits because it spoke to aliens, their dependents, and their survivors. Any law that applies a burden, which is obviously a tax or a benefit, which is participating in the programs shall be deemed to require citizenship for participation. That is an express exclusion for those aliens in the Northern Mariana Islands. So Section 19B is where Congress came back years before the effective date and expressly addressed that issue. I would like to reserve some of my rebuttal time. You may. Thank you. Good morning, Your Honors. Bridget Rowan from the Department of Justice representing the United States as the appellee in these cases. May it please the Court. This is, in fact, a tax case. The plaintiffs here, the manufacturers and casinos are seeking millions of dollars in tax refunds based on the theory that FICA taxes are not applicable in the Commonwealth of the Northern Mariana Islands because it is outside of the United States. In fact, employers and workers, regardless of their citizenship, are subject to FICA taxes because the Commonwealth is in the United States. And you get to that point first by looking at the language of the covenant, 606B, which refers to... We read the provision, of course, somewhat differently from the appellants here. 606B says those laws of the United States that impose taxes to support the Social Security system, those laws are the laws of the Internal Revenue Code dealing with FICA taxes. They become applicable to the Northern Mariana Islands on the conclusion of the trusteeship arrangement as they apply to Guam. From that point, you go to the Internal Revenue Code, sections 3121B-A-1 and 3121E. Under 3121B-A-1, regardless of the citizenship of the workers or the employers, FICA taxes will be imposed if the services performed, if the employment is being performed in the United States. So from that point, you go and look at the definition of the United States in the Internal Revenue Code under 3121E. And under that definition, Guam is included in that definition. So the fact that 606B applies the Internal Revenue Code FICA provisions as they apply in Guam leads you, once you look at the Internal Revenue Code provisions and see how they are applied in Guam, leads you to the conclusion that, in fact, the workers, regardless of their citizenship, were subject, in fact, to FICA taxes. The dichotomy that the appellants are trying to create between geography and citizenship is to some extent something of a false dichotomy, we submit, because when you go to the laws of the United States, the Internal Revenue Code, the FICA provisions, to some extent those provisions address geography. So if you're within the United States, no matter what your citizenship, and you're employed and you're earning wages, you're subject to FICA taxes. However, the exception that's addressed in the second case before you, and which counsel here alluded to, the exception to the definition of employment for workers from the Philippines, temporary workers from the Philippines who are in Guam, that's a citizenship-based exception. So the dichotomy between geography and citizenship is really kind of an artificial distinction that the appellants are making. What matters is the specific provisions of the laws of the United States that are being applied, that are being accepted, in the Northern Mariana Islands as they apply in Guam. And I think, as Your Honor also alluded to, there are numerous provisions in the Covenant, well, most particularly 601, the provision in 601 that refers to the Internal Revenue Code and the fact that where Guam is mentioned, that is supposed to, that will be deemed to also refer to the Commonwealth of the Northern Mariana Islands. There was no need for Congress, pardon me? One question I have is, you sort of engaged on this question of whether this Covenant is supposed to be interpreted as an act of Congress or as a treaty. Does it make any difference? I don't think it really makes any difference here, quite honestly, Your Honor, because the legislative history seems very clear, including the section-by-section analysis, which was propounded by the drafters of the Covenant, the Marianas Political Commission, in February of 1975. They presented that to Congress with the proposed Covenant. And then Congress engaged in examination of that explanation and they had some debates and various committee reports and there were some amendments, I believe. But the legislative history, when you look at the House reports, you look at this statement of the drafters, of their intent, it seems quite clear that the laws of the United States that impose Social Security taxes are intended to be applied, according to their terms, in the Northern Mariana Islands once the Northern Mariana Islands ended its trusteeship status. The drafting history of 606B, there was an immediately preceding version, which I guess was supposed to be the final version, but then was changed. What was the difference? Do you remember that? I don't recall. I think there was some difference with respect to benefits, but I guess our position on that is there was no difference with respect to taxes that I recall. But the question of benefits, I think, is sort of a red herring. The Covenant itself is phrased in the disjunctive. I mean, the tax laws and the benefits laws under Title 42 are separate and distinct. The obligation to pay FICA taxes is in no way linked to your ultimate eligibility or non-eligibility for FICA benefits programs. So to the extent that Congress or the drafters were changing their minds about which benefits should apply to citizens of the Northern Marianas or to foreign workers, that's a wholly separate question, and we submit it has absolutely nothing to do with this case. The tax statutes are clear. They're simple. They're broadly applicable. The whole point of these taxes is to support the ongoing Social Security system. In and of themselves, they create no entitlement to benefits on the part of an individual, which is a principle that has been established for years by the Supreme Court. So to answer your question, Your Honor, specifically I don't recall the precise changes from one version of another. I think they're not particularly relevant, I guess. To the extent they deal with benefits, they're not relevant at all. I don't recall that anything addressed a difference in taxation. All of the legislative history that we've cited and that we found rather sweepingly refers to those laws of the United States that impose FICA taxes, and there's no qualification based on citizenship of the individual workers. So it would be quite remarkable to think that Congress would endorse this provision of the covenant and refer you back to the Internal Revenue Code, but then have created this huge exception for non-citizens, which doesn't appear in the Internal Revenue Code. The Internal Revenue Code is very clear. If you're in the United States and you're employed and you're earning wages, your wages are going to be subject to FICA tax  and regardless of what might happen down the road 30 or 40 years from now when you might become eligible for Social Security. On the subject of treaty versus statute, we submit that this is more like a statute than a treaty. The case of the Saipan-Stevedore, Judge Thomas described it as an executive legislative agreement, and then the two subsequent cases involving the Quiet Title Act and its application to submerged lands around the northern Marianas. This court applied a classic statutory interpretation analysis. It did not treat the covenant as a treaty. It viewed it as a statute and applied it in that manner. Those cases are both entitled rather unhelpfully, Commonwealth of the Northern Marianas versus the United States, but they're cited in our briefs and they address this quiet title problem. But the analysis there is classic statutory interpretation. After all, this was presented to Congress. Both houses of Congress considered it. It was voted upon as a joint resolution and submitted to the President and signed by the President and then the President proclaimed it to be. It's a public law, and it can be found in 48 U.S.C. 1801. So we would say that that's a statute, but circling back to your question, Your Honor, I don't think in this particular case it matters a great deal. I guess counsel also touched on this statute that was issued before the Marianas became a full-fledged Commonwealth. That would be Public Law Number 98-213. And we read it, of course, completely differently. We think that A and B are interconnected. The purpose of that law was to ease the transition of the not-yet-citizens of the Northern Mariana Islands, and so it was kind of accelerating the benefits of citizenship before Article III really kicked in and the residents or people domiciled in the Northern Marianas became full citizens of the United States. And the idea was to relieve them of some of the disabilities of not being full citizens. And we read section, subsection B, the reference to aliens as referring to those persons in the Mariana Islands who were not yet citizens of the United States. And that's the way the Zhang Court interpreted that provision, and I think the Federal Circuit's view of that is thoughtful and correct, and it viewed the term aliens in subsection B to be referring to the people domiciled or resident in the Northern Marianas who would eventually become citizens of the United States. On the subject, I understand that counsel in the Concord case will be addressing the excise tax issue and the application. And since the counsel for American Pacific Textile didn't address that in his oral argument, I see no need for you to address it now. Correct. I think that would pretty much conclude my remarks other than to reiterate that what the covenant is doing in 606B is pulling you into the Internal Revenue Code. It either pulls you into the Internal Revenue Code or into Title 42 when you talk about benefits and their applicability. And under 3121bA1, service of whatever nature performed by an employee for a person employed irrespective of the citizenship or residence of either but within the United States. And then you go to United States 3121e, United States defined, term United States when used in a geographical sense which is certainly the case. And that's where geography comes in and is relevant. It takes you back to 3121bA1 as the district court analyzed it. Yes, in 3121bA1, it's being used in a geographical sense in contrast to Part 2 of that which is outside of the United States. So geographical sense, it includes Guam. And then under the covenant 606B, the laws of the United States that impose taxes to support the social security system are applied as they're applied in Guam. All right, Counselor, I think we have your argument. Thank you, Your Honor. Benefits and taxes are tied inextricably in 606B which makes no express reference to the IRC. Whatever application you make for taxes, you must make for the benefits programs. While Counsel argues that the CNMI was intended to be considered in the United States, a glance at the 2008 Consolidated Natural Resources Act provision where the U.S. applied the immigration and naturalization laws prospectively to the CNMI sort of rebuts pretty clearly that provision by stating that nothing in that act, nothing in asserting jurisdiction over immigration in the CNMI should be construed to make any presence by an alien prior to the effective date of that act a presence in the United States. Congress was meticulous when it granted the CNMI exclusive control over its own immigration and did not apply the INA to keep the CNMI out of any provision that defined the geographic United States or to give aliens in the CNMI any rights or foothold under U.S. immigration laws. Judge Berzon, we didn't quite get to the end of the question on 601. 601 has an express provision that says it doesn't apply if manifestly incompatible. That provision, if you start... It's difficult to be manifestly incompatible with something that isn't there. In other words, we're back to the problem  and sort of additions to the language. Even if you could do that in some circumstances, it's hard to be manifestly incompatible with a non-existent provision. I was referring to your reference to 601. Right, right. And what I'm saying is that you, at best, can get to your conclusion about 606B not by anything manifest in 606B. Well, 606B, as a treaty, as a compact, includes the information and the wisdom of the underlying legislative history in the negotiations and therefore has to include the definition of the Joint Drafting Commission that was explicitly rendered in the context of 606B and it's new as they apply to Guam Clause. 601 is the clause that has the provision that it does not apply if it's manifestly incompatible and if you were to say that 601 were a substitute for going back and applying the FICA laws, then you have a direct conflict with the provisions of the covenant under Section 703 because all of the taxes under 601 are covered back over to the CNMI Treasury whereas under 703, it specifically provides that FICA taxes are to be paid to the federal government to the extent that they apply and therefore relying upon 601 would create a direct conflict with the covenant to say nothing of the fact that they had very different implementation dates. One went into effect or was intended to go into effect ultimately almost eight years before the provisions of Section 606B were to go into effect. All right. Thank you, Counsel. Thank you. American Pacific Textile versus United States.
judges: Wardlaw, Berzon, Owens